are, and who you represent. Please call the case. 13-1066, Scepurek v. Board of Trustees of the Northbrook Firefighter's Pension Board. For the appellant. Good morning, Your Honor. Anthony G. Argyris, A-R-G-E-R-O-S, for the plaintiff and appellant, Lieutenant Gabriel Scepurek. Appellee. Barbara Adams, for the Board of Trustees of the Northbrook Firefighter's Pension Fund and its individual members who have been named, Thomas Shaw, Clifford Woodbury, Hal Sanger, Mark Nolan, and Jeffrey Rowitz. I can assure you that we've read the briefs and looked at the pertinent portions of the record. It's a fairly straightforward case. Each side is 15 minutes. If you need more, that's fine. Just make it interesting. We don't look at our watches. And we'll be ready any time you are, Mr. Argyris. Very well, Your Honor. And may it please the Court and Counsel, I have the honor of being here today on behalf of Lieutenant Gabriel Scepurek, who gave 20 years of service to the people of the village of Northbrook and to their fire department, and contributed to their pension fund during all times pertinent, and who on May 25, 2010, attempting to save the life of one of the citizens of that municipality, sustained injuries to his lumbar spine while performing CPR, and who, in the opinions of every physician that's ever seen him since, has been unable to work as a result of the incident that occurred on that date. Well, let's go back to the first thing you said, Counsel. As you said, he's a 20-year employee, so they make the point that we could retire at essentially full pay or whatever that would be. What's the difference? The difference, I think, has a lot to do with probably what's going on in this case in the background, but the difference is, number one, his 65% salary attached to rank pension that would be received as a duty disability pension would be tax-free. So in effect, or at least the first 65% would be tax-free. So there is a significant economic difference to Mr. Chypurek. Now, would that be also federal tax-free? It is, Your Honor. And insurance? Is there a difference in medical insurance? Well, there is. Now, that's not a subject that is within the subject matter jurisdiction of the Pension Board. However, the Pension Board is quite aware that in the event that Mr. Chypurek were to be granted a pension, particularly under the facts and circumstances of this case, the municipality would become obligated to pay for his group health insurance for the rest of his life and for his wife for the rest of her life and for the two children as long as they remained dependents and otherwise qualified. Okay. Go ahead. So there is a very significant impact to Lieutenant Chypurek based on the outcome of this case, not to mention potential raised judicata and collateral estoppel issues that could impact upon his pending workers' compensation cases as well. So he might get workers' comp in addition to the pension disability? As every person similarly situated would, yes. There is a workers' comp case pending and the Workers' Comp Commission has taken the case, basically suspended the case while these proceedings are underway. What this case presents is a situation where every physician, including all three physicians who examined Mr. Chypurek on behalf of the Pension Board at the request of the Pension Board, when their opinions are considered as whole cloth, have opined that Mr. Chypurek on May 25th of 2010 sustained injuries to his lumbar spine superimposed upon prior degenerative problems in that lumbar spine which caused or contributed to symptoms which rendered him unable to return to work ever since. No physician has ever disagreed. Ever since when? Ever since May 25, 2010. That date. In fact, not only has Mr. Chypurek's or Lt. Chypurek's disability been validated by the physicians who have examined him, but it was also validated by a specialized test called the Functional Capacity Exam which has, in addition to testing for what your physical capabilities are, also includes controls for symptom magnification, manipulation, et cetera, past the flying colors. And he did two of those? He did, Your Honor. In 2008, and that's a very significant point which some of the physicians had mentioned as well, in March of 2008, Mr. Chypurek had gone had sustained an injury March 17th to his lumbar spine. Ironically enough, when that happened, he was being seen by a number of physicians to try to evaluate why he was having some problems with his feet being cold. And he was reporting that his feet were being cold and he couldn't see, you know, his socks weren't helping. And so they initially worked him up for a metabolic problem, trying to see what that could be. He then went to a neurologist and he was actually scheduled to see this Dr. Mark Lorenz, an orthopedic surgeon, in regard to the foot problem, having no idea that it may be related to a spine issue. As it turns out, on March 17th, he had an incident lifting a cot. So when he saw Dr. Lorenz, he reported that incident as well as the history of the feet being cold, at which point Dr. Lorenz rendered two diagnoses. First being that there was a degenerative problem in the spine that was likely leading to the issue with the feet, because the lumbar nerve roots course off, go down the legs, down to the feet. There was some type of problem there. And also that this had been aggravated by the acute injury of March 17th. He went on to treat through with conservative measures, went through physical therapy, and passed that very same functional capacity evaluation so that he could return to work, which he did for over two years, until May 25th, 2010. But on the prior one in March, he went back to work quickly after that one, I understand. He absolutely did. He was a model patient. On May 25th, 2008, however, he was unable to return to work. The May 25th incident was witnessed by two fellow paramedics, one of whom, Paramedic Gloss, who documented in the day exactly what had happened and the fact that Mr. Shapourik, first of all, when called upon to serve this patient who was in a life-threatening situation, and actually, as I understand it, did not survive, when called upon to serve, jumped right in, was his quote. He jumped right in. He gave, he continued to perform CPR rigorously, even after he noticed that his back was bothering him. He continued to perform CPR until they were called off by the hospital personnel or personnel there at the long-term care facility. And it was upon standing up that he complained of excruciating pain. His course of treatment, you know, he tried to finish his work day, because he had actually signed up for the next shift of overtime. He could not. He went to occupational health. He went back to Dr. Lorenz, the same doctor that we're talking about before. There is this uninterrupted line of treatment from starting, you know, virtually as soon as the man realized that he really did need to get treatment rather than try to gut this one out. And that continued up to the point when Dr. Lorenz, seeing the functional capacity evaluation results, seeing also just the fact that his patient was not responding, told the man, hey, you know, I think you're going to have to come to reality. Your career as a firefighter has come to an end. Going back to the 2008 injury, as you know, in their brief, and I'm sure at the hearing, the village, Northbrook, makes a large deal about not being given a copy of the MRI from 2008. Why was that? Well, I think the real question is why the 2008 MRI was not obtained. They didn't obtain the 2008 MRI. The reason they didn't get it is because Mr. Shapourik didn't have it to give. But, I mean, as far as why they didn't receive it from Mr. Shapourik, it's because Mr. Shapourik didn't have it to give. In these proceedings, there's only one party that has subpoena power. The board. The board has subpoena power. But a patient could have gotten his own MRI. That's true. But you're not going to find anywhere in the record where the board requested that we supply them with a 2008 MRI. Did it ever come up at the hearing about where is the 2008 MRI? Not once was the question asked of us, where is it? Can you locate it? Can you bring it? It just never occurred, and there's nothing in the record. Did any of the physicians raise a question about the efficacy of the 2008 MRI? To the contrary, none of the three physicians, in rendering their reports, which is the initial expression of their opinions, mentioned the 2008 MRI as being significant or something they needed to see. It is very common that physicians and surgeons rely upon the reports of an MRI versus seeing the film itself. In this particular instance, they had a report of the MRI, although it was generated by Dr. Lorenz, the orthopedic surgeon, versus a radiologist. So we never had the radiologist's report, nor the MRI. I mention this issue about obtaining versus being given because it is the pension board's exclusive duty to get the reports. The three reports are part of their duty under the specific dictates of the pension code. But they'll turn around and say, but it's your burden of proof. Understood. It's our burden of proof, but we believe we've carried that far and beyond because every medical witness in the case has said they've rendered their opinions to a reasonable degree of medical certainty, there is a causal nexus, and the 2008 MRI did not prevent that. I also think that there's this inconsistency, this gamesmanship being played by the board because when we talk about the 2010 MRI, they acknowledge by in their own brief and by citing to the testimony of at least two of the physicians where MRIs by itself is a picture in time. An MRI can't tell you this injury happened at this date because of this cause. And so when we show them the 2010 MRI, we say we haven't proven our case. The 2010 MRI doesn't prove causation. The 2008 MRI, which isn't even on the date of the crucial injury, that was critical evidence. And without that, they're confused. They can't understand the record. They're having difficulty reading their own physician's reports as well as the report of Dr. Lorenz, all of which are in plain English that all of us can seem to understand. So in a nutshell, what would you, in layman's terms, what would you say the board's decision was on the issue? The board's decision was conscious disregard of the opinions of every physician taken as a whole. Instead, looking only at, consciously disregarding the totality of their opinions and looking only at sections of their opinions where they talked about degenerative conditions, genetic predispositions to injuries, etc. But there's no place that the board has ever been able to cite where any physician, whether it be a treater or any of the three they selected, has stated that the May 25, 2010 incident was not a contributing factor to the ultimate disability. The board would have us believe it's mere happenstance that this man, after passing a functional capacity evaluation in 2008, after coming back to work, after jumping in to save this person's life on that day, so we know he could work, that after being able to work on that date and then being unable to work after that date, the incident that's interposed in between, the May 25 incident, witnessed by a co-worker, documented in the date, that it's mere happenstance and has nothing to do with the two occurrences. I mean, it's simply preposterous. As the court in the recent Lambert v. Downers Grove Firefighters Pension Board stated, they did a, they noted that the, and it's true in this case too, the board cites no Illinois case where a board's decision to reject the vast majority of the medical evidence and deny disability benefits has not been found to be against the manifest weight of the evidence. In that case, the court says, our research reveals instead that in such a situation, our courts have consistently reversed the board's decision, and they go on to cite a number of cases, including the Kouzoukas and Rozak cases that we rely upon here, and that's at paragraph 41 of the official opinion. This is exactly one of those cases. It is what I call the modus operandi. We're seeing this modus operandi. We've seen it in Rozak. We've seen it in Lambert. We've seen it to a certain extent in Kouzoukas as well. Another case that has some similarity to this is the Rose. Correct, which we cited on the statute, we cited as to the standard of review, but which if you look at it also has some pertinence to this one. The reason I didn't discuss Rose at length is because it's a little more complicated. There actually is just a touch of controversy in the record there, where there's none here. But Rose is also a very good example of this. Your Honor, if I may be so frank as to say so, Justice Quinn asked earlier, what's the difference here between the 72% salary attached to rank on service pension or 65% here? The difference is we know now that there's other stakes in the game. There are these other benefits that we're talking about. And that is why we've seen some of these decisions. You know, we have budget issues. We have concerns like that. But they don't change the rights and responsibilities of the pension applicant or the board. And we see these budgetary pressures create decisions like we see here, like we see in Lambert, like we see in Rozak, like we see in Kazukas, like we see in all these cases, Rose, where the courts, by God's grace, have come in and given a substantive administrative review rather than acting as a rubber stamp for the administrative review with very little else to their argument other than please don't re-weigh the evidence. Because we know where that goes. So there is no case they've cited that has any semblance of similarity to this case at all. They only cite two cases. One is the Everett case. And in Everett there were three physicians' opinions on the issue of causation and disability. Dr. Schell, Dr. Paul, and Dr. Pickard. Dr. Schell, Dr. Paul, and Pickard all agreed on disability, but only Dr. Schell was able to opine or opined on the causation issue. And Drs. Paul and Pickard were instead unable to say that there was a causal nexus between the injury and the disability. So there's no analogy between Everett and this case. Pain doesn't even have to do with the medical causation issue. Pain has to do with whether a Chicago Deputy District Chief could perform the duties of that position and what those duties and responsibilities were. There's not, there's no semblance of any kind, no resemblance between Everett and this case. In sum, we come back to how the Lambert case I think aptly characterized and summarized the law. There is no other Illinois case where you have overwhelming evidence, let alone in this case the unanimous evidence that we have, when the records and the opinions of the physicians are considered as whole cloth. It was the Devaney v. Calumet City Police Pension case, one of my cases actually, where this picking and choosing among what the doctors have said, focusing on the degenerative and excluding the traumatic was rejected by this very same court. And it has to be rejected again here today. And when we do that, and we apply the law as we see in these cases, there's no conclusion but that Lieutenant Shapirok is entitled to a line of duty disability pension under the law as stated within 4-110 of the Pension Code and virtually all of the pertinent cases that interpret that Thank you. Ms. Adams. Good morning. Good morning. The Pension Board very carefully considered this case. You have the opinion of the Pension Board, the final order and decision where they made lengthy findings of fact, lengthy analysis of the evidence and testimony. And there was a lot of it. There was five days of hearings. There were three doctors testifying. Lieutenant Shapirok testified as well. And the plaintiff had many opportunities to introduce evidence in support of his case. The doctors are selected, hired, and those three doctors are the exclusive physicians that the board relied on. And they're appointed or selected by the board itself. State law requires the Pension Board to have three opinions from three independent physicians. Those three doctors, Dr. Shapiro, Dr. Bernstein, and Dr. Nolden, provided written reports and then they provided oral testimony. There are other medical reports from Lieutenant Shapirok's doctor. Right. But these doctors are the doctors for the board. They are hired by the board to advise the board on the application of Lieutenant Shapirok. So the answer is yes. Yes. And significantly, the Pension Board never heard from the treating physician. Dr. Lorenz was the treating physician. He was never called. In many of these cases that Mr. Argyro cites to you, the treating physician testified. He did not testify here. Justice Simon's question, the board's three doctors supplied reports. Two of them signed certificates of disability. And as pointed out in the reply brief, Dr. Nolden, who did not sign a certificate of disability, testified, yeah, this injury is due to the May of 2010 incident was a causal factor in aggravating the yes, yes it is, including the functional limitations of the FCE, I imagine. Right. So your complaint is that the plaintiffs, so while your three doctors are unanimous that this is a duty of disability, right? I don't believe that that's correct. That's not what the Pension Board found. The Pension Board found that the written report, in the case of Dr. Shapiro and Bernstein, you had a written letter report and then you had a certificate. After they read those, reviewed those, and heard from Lieutenant Shapirok, they said we need to hear from these doctors because the written paper doesn't add up. We need to hear from them. We need to ask them questions. We need to understand why they wrote what they wrote. And they then had each of those doctors come in so that they could understand why there were discrepancies between the written reports and in the two cases where the doctors did the certificate form. They said, you know, what's going on? We want to hear from these doctors. They did hear from those doctors. And what they found was those doctors all said, yes, the CPR incident could be a cause. It could be the cause of this disc issue. But we can't say for sure because it could be a lot of other things too. And we don't, none of them said absolutely this is the cause. They all said it could be. But that's not enough. But is that ever the case where the doctors, well, I'm sure it is, where they say definitely this is what happened. But in my experience dealing with medical cases, when you deal with experts, it's usually what they say is it could be a contributing factor or it could be a cause. They are reluctant to say definitively anything, frankly. Well, but they do Unless a fireman fell off a roof and broke his legs, they'd say yes, falling off the roof was the cause of his fractured legs. But typically experts say, given the etymology of whatever happened or the history of the patient that this could be a contributing factor to his condition. I mean, usually they stay away from definitives. That may be true, that doctors don't want to be pinned down all the time. I think that that's probably correct. But I think one of the significant things in this case is that we don't have all the evidence for those doctors to look at. We have evidence in the record that plaintiff put into the record, the notes, the treatment notes of Dr. Lorenz that say there's a 2008 MRI that was taken before the patient was seen by Dr. Lorenz. They could have asked for it. Well, they could have, but plaintiff could have put it in because Dr. Shapiro, plaintiff's counsel, stated that no doctor asked for that report. That's simply not true. Dr. Shapiro specifically said in his testimony and we cite in our brief on page 19 where Dr. Shapiro said, where's the 2008 MRI? I would need to see that. He didn't. Plaintiff had ample opportunity to introduce it and he didn't bring it in. It's his burden of proof. The doctors testified out of their reports which was a distillation of the information that they had had which would have included the review of the MRI. They did not have the 2008 MRI, Your Honor. Well, you would take the 2010 MRI, as counsel points out, as being worthless. But it's your argument that while the 2010 MRI is worthless, the 2008 would be vital? We did not testify. It's unfair to characterize the 2010 MRI as worthless. And the pension board didn't say that. The pension board said, does this MRI prove that this incident caused this injury? The doctor said, well, I can't tell exactly what caused it. I don't know if it's the CPR. I don't know if it's something else. It could be something else. But what Dr. Shapiro specifically said was, it would be helpful to me to see the MRI from a couple years earlier. And notably, that MRI was, this is the fact that plaintiff doesn't like to talk about, is there's a 10-year period of silence. So you're asking us to write, I suggest for the first time in Illinois, which I'll ask you about in a second, to hold that a pension board can, in a back pain complaint, which is the vast majority of complaints we see on appeal, we don't normally see complaints when state troopers get their legs torn off, or as Justice Pierce points out, firemen fall off roofs and burn to death. We don't see those. They're smart enough to pay off on those, I guess. I'm sure through their open-heartedness. But on the back pain injuries, which we see a lot of, we should hold that where the board has a hearing, here is the employee complaining of back pain, and the board doesn't believe it. And therefore, they can tell their own doctors they don't believe them either, because they're just relying on the liar employee, and therefore they can discount the certificates of disability. We should do that, right? That's what you're asking us to do. No, Your Honor. What are you asking us to do? No, what we're saying is that testimony, that there is a case that plaintiff cites that says that evidence given to doctors who are not treaters, statements by the patient may be evaluated differently than statements given to the treaters. The thing that is so important in this case that plaintiff has glossed over Let me answer my question, though. So going back, so it's really a case question. Then let's go back to that. Let me rephrase the question to make it easier on you. Cite a case that holds, that what you're asking us to hold, which is that the three employee, employer doctors can come in and say he's disabled. Signed certificates of disability, two of them. And then the board says we're still not paying him as being disabled. They agree he's disabled, right? There's no question. The board in their 20 pages said we agree he can never be a fireman again. There's no question he's not coming back. He's not lying about the back pain. He's severely injured. He can't come back. We agree with that. We just disagree as to the cause of that injury. We don't think it's due to this injury in 2010, and we don't think it's due to the many other prior back injuries. We just don't believe them. What's your best case where you're allowed to do that? Where pension boards can disregard their own docs and based on what they feel to be credibility issues involving their employee, can deprive them of the duty of disability? Your Honor, I would cite a couple of cases. One is Evert and the other is Payne. And if I may just say that I think Your Honor's question presumes an injury when in fact what we may have is a condition, a degenerative back condition. And that the injury, the whole question when the pension board is charged with deciding is, is there an act that causes this disability? Is there a duty act that causes this disability? He was working that shift, right, as they point out in their brief. He goes to work. He shows up for his shift, as he had for every day for the previous two years anyway. Don't worry about it. For two years anyway. And he's there. And he's there for this shift. And he tries to stay for the shift and he can't. And everybody agrees. Even the board says, well, he can't work. He's a very, say, injured disabled. No question he's disabled from that point forward. And now you want to say, well, even though we can see this disabled from this point forward, this point being the CPR incident, that has nothing to do with this. That's not, it's clearly an act of duty, but that's not the cause of this, right? And you cite Evert for this suggestion, that we'd at least be able to cite a 1989 case out of the second district, written by Bob McLaren, who wrote the dissent in the Lambert case, which read one sentence, the reports of all three doctors attributed Evert's disability to a degenerative condition in the lower back. And then you cite Payne. I was on Payne. Right? I'm one of the concurring justices with Justice Conard. And that case, as counsel said for the plaintiff, involved a deputy district chief who didn't have to pick up a hose for the rest of his life. He could have sat at a desk or driven out and watched the fires like a reporter would. And we held in that case that he could do the duties of a deputy district chief, but not of a fireman. Because the only issue in front of us really was, could he drive, could he be driven? They don't even drive. They're district chiefs. They're driven to the scene of a fire and look at the fire. Yeah, he could. And that's what we held. And I think that the thing that we have here is Evert is the most analogous factual case. You have a guy who had a degenerative back condition that was preexisting. He had an incident on the job. He some hours later said, gosh, my back really hurts. Went to the doctor. Same thing happened with Mr. Spirk. He went. He has a preexisting condition that's been established. He then shows up. He does the CPR. He says, my back hurts. He goes back to work. He doesn't immediately go to the doctor. He goes back to work sometime later. The next day he goes back, because this happened at 2 in the morning, he goes back the next day and says, gosh, I can't work anymore. I need to go to the doctor. They take him to the doctor. That's fine. I think that that's very analogous. Well, let's go back to the doctors. So now the three village docs in Evert, do they all say, do they sign certificates of disability as your two doctors did in this case? And then one testifies, yes? We don't have that information about the Evert case. What we have about the Evert case is that he was, he did have a degenerative back. He did have a pain in the back subsequent to the act of duty that the pain began to reduce and was somewhat temporary in nature, but he ultimately had a back condition that prevented him from returning to work. The pension board here found the same thing, that he had an incident. He had pain. He testified that he had pain. He testified that he had leg pain at the time and for a period of time after. But over time, all the doctors, all of the doctors say that that pain has largely resolved. He really isn't having that shooting pain that he used to have. Of course, he's not picking people up on stretchers either, right? So yes, if he's sitting at home or in a hot tub, he's not in very much pain at all. If he does the normal things like I would do, sit at my desk and watch TV or read briefs, he's okay. Now, if he were to go pick up some large guy like me having a heart attack or give me CPR, I'll bet his back would hurt an awful lot. And they agreed with that, right? The board agreed. He cannot be picking people up again. He's, they just say, disabled. We can agree they said he's disabled. That's agreed that he is disabled. The question is, did he show that the causation piece, which is what he's required to show, and it is his burden. And, Your Honor, in the pain case, you said he didn't meet the threshold. It's a threshold that the plaintiff has to meet. He has to show, he has the burden to show causation. He didn't show that connection here. We don't know what it said. And we don't know. When I speak, even when I cut you off, and I apologize for cutting you off, but even when I cut you off, I'm the judge, I get to cut you off. I don't apologize. I should not cut you off. So, going back, in pain, did the City of Chicago's doctors come in and say, oh, we think he's disabled? I suggest to you, no, they did not say that. Your problem is your witnesses. All three attributed this, two of them signing a certificate, one testifying, this is what occurred. You have exactly no medical doctors on your side. Your argument hinges on the missing treating physician, on what is missing. Well, I don't have the 2008 MRI, therefore, I can find that that would certainly hurt him. And I don't have his treating physician didn't testify. Ah, that must have helped us, too. And that's not how this works. At least, I've never seen that before. So it's quite novel to me. I love lawyers who come up with novel ideas. I really do. It makes this job much more interesting. But those are novel ideas, I'd suggest, counsel. On the May 25th CPR, Mr. Gore was there, G.O.R. How does he pronounce that? And the two of them, at the time it's happened, when he has to stop the CPR because of the pain he's talking about, they're literally writing a report at that time about the onset of this injury. I believe the report was dated that day or within a couple of days. It was contemporaneous, and it was witnessed by the two fellow firefighters who were there when this happened to Mr. Sport. And there's no dispute that the incident occurs. There's no dispute that he had pain at that time. The question is, was there, was that the ultimate cause of the disability that keeps him from working? Is it the standard ultimate cause, or is it a contributing cause? Under your theory, no one would ever get this. The thing is that here's a man who's had, they talk about congenital, genetic, other types of reasons that this can happen, but when it comes to the actual duty-related incidents, you've got June 8th, 1989, July 28th, 1991, January 11th, 1995, October 2nd, 1995, January 7th, 1998, March 2nd, 1998, September 4th, 2007, January 7th, 2008, March 17th of 08. You get the pattern? The point is this. Between whatever it could have been, the exacerbation of his condition is clearly linked to his service as a fireman. And the last iteration, which is the capper on this and took him out of it completely, was not the one where he lifted up the cot, which he also injured himself with, but when he did the CPR. So there is, there's, nobody has discounted that this, that that's what happened here. But instead what happened with the board's view of this is that first of all, since he had put in a prima facie case, if they wanted to rebut it, they should have done something about it, and they had the subpoena power and all the assets in order to do that, and they didn't do that. And so in terms of chronic disabilities, things get reactivated because of the disability. You're prone to it. And this fellow walked into the breach every single time, and as you said, right after the March 25th incident, he came back in again. He couldn't get enough of this job. But he paid the price for it, and it was documented. So it just, with what the doctor said about the condition, these are not siloed items. These are a continuum of experience relating to a condition this man had. And you have an iteration of it, particularly at the end, where he just, where he had an induced harm based upon the work he was doing as a fireman. And that's what triggers what the result of this case is supposed to be about, which is what he's seeking. He's seeking duty disability. And with all of these duties that he performed, how can you deny that? Your Honor, one of the things that the court found very important was that when you look at that list of incidents that you recite, there are periodic back strains of different kinds over a course of time up to 1998. Then from 1998 to 2008, there is no back reports. Some of those reports that are in that list the plaintiff's provided are not back injuries. 2008, he comes to his department physical, and he says, you know, my feet are cold. I think I might have a bad back. And it might be related to my job. It was. August 28th, 08. October 29th of 08. March 9th of 08. July 13th of 09. Those, Your Honor, those are after this 10-year period of silence. And there is, he comes to his fire department physical and says, I think I have a bad back, and I think it's because of my job. Yet this is a guy who clearly knew how to report and had made no duty related report for 10 years. The pension board said, that's just unbelievable to us. So if he's a good employee and didn't seek sick time or worker's comp or disability for 10 years, he's an untrustworthy guy. And that's your theory? That was your board's finding? Not untrustworthy, Your Honor, but simply a liar for not calling in sick. No, Your Honor. That's bizarre. I think that's an unfair characterization of what the pension board did. What the pension board said was, there's a period of time where his back may, the arthritis got worse. The degenerative back got worse. But it wasn't from a job related thing because he made no claims of job related things. Those don't equate. Those don't equate. It's when you go to the doctor and you say, doctor, when I put my arm up, it hurts. He says, don't do that. And you don't do it. So he just, this wasn't a plan. This man's not a malingerer. Now let me ask you this question. The board, somehow, telepathically, paranormal, whatever it is, the board's determination is that because this firefighter, Mr. Sprucek, he drove there for the hearing and he sat there for an hour and 45 minutes. And by watching him sit there, they came to the conclusion that he had no injury. Now, could you tell if any of us have one? Your Honor, that's not what they concluded. They simply observed that he did not exhibit symptoms at that hearing, which was more than a year after the incident. And that goes to and links to the doctor's statements that the pain by that point had substantially resolved. What kind of value and weight can we put on a board that has a self-interest in this in saying that by viewing somebody sitting for an hour and 45 minutes in front of them could reach that conclusion? Your Honor, that's one line in a 20-page carefully reasoned opinion that is facts. And the board answered that in the briefs. We've said that that was not a reason to say he is or isn't disabled. You made the best statement you could have made under the circumstances in your brief, but it doesn't take away what they did, what they looked at, and how they viewed it. Before we go back, Ms. Adams, to a question that was asked before Justice Simon and I went off and opened up our hearts about this case, Justice Pierce asked you, is what is the statutory burden of proof here on the plaintiff? Is it actual cause or is it just merely a contributing cause? It can be a cause. And it does not have to be the only cause to be a valid cause under the pension statute. How is this not a contributing cause? And if I may, Your Honor, your question earlier, and Justice Simon had questions, so I didn't get a chance to answer you, but you said, well, isn't this a novel idea to say that we're going to not give him the pension, but the point of... Disregarding your own experts, there's no medical experts on your side. Normally we don't see people come up and say, don't believe my witnesses. I've been here 17 years and I've never heard that yet. Not where it's unanimous. I've heard it, don't believe most of my witnesses. That happens a lot. But never all of my witnesses. Your Honor, the pension board's position is don't look at one piece of paper to say what my witnesses say, what these doctors say. You have to look at these doctors as a whole. You have to look at their testimony as a whole. They may have marked that certificate, but when they came in and testified, those two doctors, Bernstein and Shapiro, they both said, this could be caused by any number of things. And I don't know what is the cause. And because you had a distinction between the certificate and the written report, that's why they were asked to come in and testify, they did come in and testify. And in their testimony, when you look at it as a whole, you have to say there is a question about what is the cause. The cause. But they all agreed it was a contributing cause, didn't they? No, not necessarily. Well, what did they all agree as to the incident? Did they all agree that the incident occurred the doctors, that the incident occurred and that it could have been a contributing factor to his admitted disability? That there were any number of things that could set off a disc problem. Including this incident. This is one potential. Among others. Now, that's what we would call parsing. The way I look at this, and tell me if I'm wrong, the three physicians engaged by the village, all were of a mind that this incident could have contributed to his disability that we all agree he has. Is that correct? And that the board relying on their three experts chose to ignore that conclusion. They're contrary to their own experts. Without anyone supporting the board's position that it wasn't a cause of his disability. That's where I struggle with this. Because their own theoretically disinterested experts support the conclusion that the disability that is agreed to, not disputed, could have been caused by this May incident. The CPR incident. Now, you have the board then saying, notwithstanding that, we're going to deny the request. Without any evidence, as I see it, supporting the denial. There is question, and the pension board said, there is a question here about the disability, when, what was the condition of his back, and what information did the doctors get. And they said, we felt that. And what evidence are they relying on to justify that question? Is that a reasonable question based upon the status of the record? That's the issue, really. All of the doctors. In other words, excuse me. I didn't realize. No, but it just seems to me that a function of a tribunal is to listen to the evidence from experts. That's why we have experts, because the layman just doesn't have the it's outside their expertise. So they have the experts testify, and then totally go the opposite direction without any support for that direction they're going into. That's the difficulty in this case. There's nothing here supporting the board's conclusion that they have a question. They shouldn't have a question based upon the evidence. But they do have a question, because all the doctors said. Is that reasonable, then? Well, the pension board felt that it was, and I think that when the burden is on the plaintiff, and when the finding of the pension board is under the administrative review law, that's prima facie correct. I think that when they find that there is a question about the doctor's testimony, and a question about what the doctor's conclusions are, and that there is potential for more than one inference to be made, plaintiff's obligation isn't to make inferences. Plaintiff's obligation is to make proof. And the pension board found that under the standard in Payne, under the standard in Marconi, that those inferences were not enough. That they felt that there were gaps in the evidence, gaps in what the doctor said, gaps in the material provided. I mean, clearly the MRI is Mr. Sapoorik's MRI. He could certainly get it and provide it. If he couldn't get it, he could ask the board to subpoena it, and they could do that. But he didn't. And so the burden is the plaintiff's. The pension board, you know, this puts the pension board in such a difficult position, because people assume it's like a trial. And it's really not. It's three, it's five members, three of whom are firefighters, sitting there hearing an application from one party who is represented by counsel. There's no adverse party. They aren't in the role of being a prosecutor. They aren't in the role of fighting and bringing in all this other evidence and doing all this other investigation. It's not their job. Their role in the briefs of the plaintiff is characterized. Their role is not to go out and do all of that. Their role is to listen to everything that's provided and say, if something isn't here that is important. Why should they have subpoena power? Because the plaintiff can ask for that, and that has happened before this board, where a party says I need X, Y, Z records. Will you issue a subpoena for it? They always say yes. But I don't know that it's the pension board's role to say that. I know you are frustrated by that. But I think that this isn't a trial, this isn't a traditional trial situation where you have two advocates banging heads and bringing in evidence. This is one party with counsel and five guys sitting there taking the evidence, doing their best job to assess it. What you're talking about is what the doctors looked at but they testified to that. It's incorporated into their testimony. Basically what happened here is that these doctors were impeached by the board themselves. This is like the Lambert case. This is, and it's, they in the Lambert case did the same thing they said they did here. They watched the demeanor of the applicant for this determination to determine whether or not he was credible. It's like back to Salem witches. What is empirical here? This record shows that they have looked at something and taken a totally different view of it than frankly from what I'm listening to the questions and the answers. I don't think they were looking at this the right way, frankly. I think you've already got the impression of that. We're going to look at this very carefully, but they had all the tools at their disposal. They picked and chose what they wanted to do and how they were going to do it. And these doctors testified based on what they saw and what they saw they were allowed to recount. And under the rules of evidence they're permitted to do that. Take a look at section B on statements for purposes of medical diagnosis and treatment in the rules of evidence. Statement made for purposes of medical treatment or medical diagnosis and contemplation of treatment in describing medical history or past or present symptoms, pain or sensations. Are there inceptions or general character of a cause or external source thereof insofar as reasonably pertinent to a diagnosis or treatment but subject to rule 703? And it continues on when you get into section B. It says statements made by a victim to medical personnel for purposes of medical diagnosis or treatment including descriptions of the cause of symptom, pain or sensations or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to a diagnosis or treatment. This envelops everything. It allows everything to be to come within this rule of evidence. And how they chose on the board to parse this out and to pick and choose what they wanted frankly doesn't fit with the pattern of what this applicant did. He worked. He took care of himself when he could. When he was injured he worked afterwards. He didn't give up. Again, he's not a malingerer. And some days were better than others. But the bad days were the ones that were caused by what he testified to as acute injuries caused by these incidents of trauma to him which included the March 25th date and I can't remember which, the lifting of the cot, which were the two most recent. So here's a fellow who for decades has gone through this problem with his back and showed up to work every day. I should wrap it up if you would. Unless you have a response to what I just said. Well, Your Honors, reading from a rule of evidence that I think is really not entirely applicable because in this case what the pension board is saying is in order for the doctors to do a fair evaluation of whatever's the change in his spine over time, we know there was an MRI in 08. Nobody knows what it says. And there's a claim that there's a change. We'd like to see that. Without that, why, you know, why is it their burden to be prosecutor to seek that stuff out? Why shouldn't plaintiff have the burden to bring that in and say that was then, this is now, there's clearly a change. If that had been brought in, I think what would have happened is what the Payne case was talking about is plaintiff would have put his burden over and shifted that duty to the board. Let's assume there was no more damage in the 2010 MRI than there was in the 2008. I'm sorry? Let's suppose for argument's sake that the 2010 MRI was identical to the 2008. Does that show then that the damaged spine in 2010 during the CPR had no impact on the spine? I think it would be a factor that the doctors would have to consider and say what happened. But under the statute, it's other acts. So any continuing, any acts he had, any injuries he received in the 20 years or in the 18 years before the 2008 is held not against the employer, but it's something that they're going to have to pay for. We understand that firemen, every fireman who's been on the job 20 years will have a bad back. All of them will have twisted spines. If they actually fought fires or picked up people, they're all will. And there's a cause of concern then that if every single fireman who has a bad back wishes to go on disability instead of on to retirement or continued duty, that that would bankrupt the pension system in a matter of months. However, the way to prevent that is they have to go take FCEs, they have to be seen by doctors, and these doctors are appointed by the board, the pension board. And that's where it has to be stopped. If you think it's bad, if you think it's fraudulent, this is not active duty related. You've got three docs in your employee who can talk to them, evaluate the person, and say whether or not it's a part of a cause. Not the cause. A contributing cause. And you were struck out. Well, what we have here, Your Honors, I believe is a case where cumulative effects of active duty hasn't been proved. They have not taken the stack of evidence and put it before the board. The cumulative effects of reports tell us if the cumulative effects are this bad back. The focus of the evidence was on this CPR incident and the focus of the argument in the briefs has been on this CPR incident and not on a cumulative effects argument. That is not the argument that has evidence in the record to support it. If there is an argument here, it is over this 2010 CPR incident. The pension board's finding was there is no cumulative effect of active duty because he didn't take this pile of stuff and put it in front of any doctor and say, doctor, looking at this 20-something years, what do you think? He didn't do that. He never did that. We have a single act. The doctors say it could be a cause. No doctor says it absolutely is the only cause that it could be. The pension board has a fiduciary duty to all members of the fund to examine these cases carefully. They did a 20-page opinion carefully examining the evidence in good conscience, did a lot of work to try to evaluate the situation and I believe accurately found that the plaintiff failed to meet his burden here. He is disabled. There is no doubt about that and I think the pension board feels bad about that. But I think they also feel that he did not prove that the ultimate disability was related to an active duty. This guy just had the unlucky circumstance of bad genetics or whatever and has a bad back. And that is the cause of his disability. Thank you. Thank you, Your Honor. Mr. Arcarus, very briefly. Yes, Judge. I'll try not to violate too badly the old adage when you're winning, shut up. But first of all, a couple of things. If the court were to turn its attention to, on this issue about that there is some kind of vacillation or equivocation in the doctor's opinions, Dr. Shapiro, on the question of causation, on page 37 of his deposition was asked, starting on line 21, okay, and the reason I'm asking this is one of the key things we're looking at, is it a catastrophic injury? Was it caused by this incident or is it something that's degenerative or you know it could happen to anybody, the same thing that happened or was it the result of the job he's doing? Answer, sure, it's a good question. It appears to me, based on everything I know about this case, that he had an asymptomatic degenerative condition in his back that was aggravated when he was doing CPR in 2010. And as a result of that, that aggravation of that pre-existing condition continued to remain symptomatic. Was that the one where you had the herniated disc? No, this is the CPR incident. And so, well, the herniated disc, there's, you know, there's one thing that makes it always difficult when you're talking about herniations, protrusions, bulges, is there's different nomenclature used by different doctors. So you talk about one thing with one and you're talking about, it's apples and apples sometimes, but they're using apples and oranges terminology. Other times, they're talking apples and apples, but it's really apples and oranges that they're talking about. So on the question about the herniation, I think Dr. Bernstein gave some of the best testimony because he mentioned that although there's degenerative disc problems in Mr. Shapirok's spine, the L5S1 level actually was not very degenerative. It was, as he called it, juicy and had maintained disc height. And there was a chunk that had come off of it, very much the same way as Dr. Lorenz had described it, which was causing some of these symptoms. So, Dr. Bernstein, I thought, got real focused on that. What really is important here is this. Mr. Shapirok was able to work on and before May 25th and unable to work afterwards, and there was this incident that would be a competent cause for why he would be unable to work, why his underlying condition, if that's all it was, just aggravated, was aggravated on that date and became symptomatic. Those symptoms, I think here's the big irony about the case. The very same symptoms that disable Mr. Shapirok, which they are exactly the same ones that all of the doctors are basically saying are what they used to establish a causal nexus. So the very same evidence, Mr. Shapirok's credibility, Mr. Shapirok's witnessed incident, Mr. Shapirok's passing of the functional capacity evaluation, that's the same evidence that's credible to this board even on the question of disability, but they're going to say that the very same evidence from the very same source is incredible on the question of causation when really the doctors say what we do is we take a look at all the facts, we take a look at the applicant, we take a look at the FCE results, we take a look at the medical evidence, and if it all fits together then we're going to say there's causation. The role Justice Simon, I think, made some points about the board's role. The board describes its role in their own brief as having their disability pensions in the fund, which requires the board to ensure that adequate funds are available to pay current and future disability pensions to all who qualify. An important part of the board's responsibility involves screening of unqualified or fraudulent disability claims so that funds are not unfairly distributed to undeserving applicants. That's what the subpoena power is there for. That subpoena power is there to protect the fund. Here, among other things, the board says we could have called Firefighter Goss to testify to what he said in his report. Just as Your Honor said, it's highly unusual if not bizarre to say ignore all my witnesses, it's also highly unusual if not bizarre to call someone to testify again to something that has already been in a report that's in evidence and was created in the day. What would be considered more reliable? What Firefighter Gore would say? Or what Firefighter Gore wrote? We all know. We've all made that argument. We know where it goes. So to avoid violating the rule about when you're winning, shut up. I want to thank the justices for clearly having reviewed the record in this case, for having studied the applicable law, and for giving, it is hoped, Mr. Shapourick justice, and to remedy an injustice that has occurred as a result of what the board has done. I will say one thing, and it's not too often that I tip my cap to my opposing counsel, but I don't think Ms. Adams has any case to stand on today, but she certainly demonstrated she can stand in the ring and take a punch. But nevertheless, there is no merit to any of the board's arguments. They are pretext. They should be rejected. And an order requiring the board to grant the line of duty disability pension should be entered by this court on administrative review. Thank you. This case will be taken under advisement. We wish to thank both parties for their fine briefs and their oral arguments. And this court will be adjourned.